IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane

Civil Action **No. 01-cv-2313**

**GLN COMPLIANCE GROUP, INC.,**

> Plaintiff,

v.

**JONATHAN ROSS,**

> Defendant and Counterclaimant and Third Party Plaintiff,

v.

**GERALD NAEKEL,**

> Third-Party Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

**Kane, J.**

On November 30, 2001, Plaintiff GLN Compliance Group, Inc. ("GLN") filed a

complaint  asserting a variety of claims against Defendant United Airlines ("United") and

Defendant Jonathan Ross ("Ross") based on an alleged breach of contract by United, doing

business as United Biz Jet Holdings.  Shortly after GLN filed suit, however, United declared

bankruptcy, and these proceedings were stayed pending the resolution of that matter in the

United States Bankruptcy Court for the Northern District of Illinois.  *See* Order Staying Case

1

(doc. 51).  On October 16, 2007, I lifted the stay, dismissed the claims against United,[1] and ordered Ross to answer GLN's complaint – specifically, GLN's claims against him for civil theft, civil conspiracy, and intentional interference with GLN's business relationship with United.[2]  Shortly thereafter, Ross filed his answer, and he asserted counterclaims and claims against GLN and Gerald Naekel, GLN's principal, for defamation, outrageous conduct, and abuse of process.

Following a protracted pre-trial period punctuated by numerous requests  for withdrawal by GLN's and Naekel's various counsel, this matter was tried to the court sitting without a jury for five days beginning on February 8, 2010.  Following the taking of testimony, an adjournment was declared to afford the parties time to submit written summations and post-trial briefs.  The process was delayed even further by a stay order from the bankruptcy court when Naekel initiated his own bankruptcy proceeding.  Now being fully advised, pursuant to Fed. R. Civ. P. 52(a), I make the following findings of fact, conclusions of law, and order in this memorandum opinion.

## FINDINGS OF FACT

In the summer of 2000, a consulting firm recruited GLN to furnish certification manuals and support for United's efforts to obtain operating certifications from the Federal

---

[1]  Although I did not dismiss United's counterclaim against GLN, the counterclaim was transferred to the U.S. District Court for the Northern District of Illinois.  *See* Order Transferring Counterclaim (doc. 109).

[2]  GLN had also asserted a claim of outrageous conduct against Ross, but this claim was dismissed.  *See* Order Dismissing Claim (doc. 99).

Aviation Administration for the operation of a fractional-ownership on-demand charter airline. Tr. 39: 13-17.[3] GLN and United entered into a contractual relationship for the provision of these services on November 20, 2000. Tr. 45:24 - 46:10; Exhibit 10. Initially, this contractual relationship related to United's Part 91 and Part 135 certifications.[4] *See* 14 C.F.R. Parts 91, 135; Tr. 46:10-12; 47:4-8. Under the terms of the contract, GLN was to furnish the technical manuals and support, while United was to furnish the required personnel and aircraft necessary to obtain the certifications. Tr. 48:3-8; 59:3-5; 62:2-3, 17-18.

By late December 2000 or early January 2001, GLN had submitted an initial set of technical manuals to the FAA on behalf of United. Tr. 75:17-18. Despite this initial "success," the relationship between GLN and United quickly deteriorated. Foreshadowing the events to come, GLN's principal, Gerald Naekel, began complaining that United was not making the necessary payments for services rendered, supplying the necessary guidance, or providing the required personnel or aircraft necessary to obtain the certification.

In response to these concerns, GLN and United modified their agreement, giving GLN management of the overall Part 135 certification effort. Exhibit 14. GLN agreed to furnish key personnel to United in the form of a Chief Pilot, a Director of Operations, and a Director

---

[3] The majority of the testimony and exhibits is devoted to detailing the business relationship between GLN and United. The majority of this information is, at best, only tangentially relevant to GLN's claims against Ross and Ross's counter-claims and claims against GLN and Naekel. Nonetheless, I provide this background to put this dispute in context.

[4] The Federal Aviation Administration has promulgated a variety of regulations requiring providers of air services to secure certifications for their operations. The nature and requirements of the various certifications depend on the nature and type of services provided.

of Maintenance.[5]  *Id.*  The parties also agreed to broaden the scope of their agreement to include a third certification effort under Part 121 of the FAA's regulations, which was designed to be for a separate United Business Jet Airline that would engage in on demand services for larger companies, using larger aircraft.  Tr. 86:15-24; 87:3-4.

Shortly thereafter, Naekel contacted Ross and requested that he serve as the Chief Pilot for United's Part 135 certification project, and Ross agreed to assume this role.  Tr. 79:8-18; 835:2-7.  In exchange for Ross's services, Naekel agreed to pay him as an independent contractor of GLN at the rate of $15,000 per month, plus expenses.  Tr. 372-24 - 373:7.  Ross was required to submit invoices to GLN, who would pass through the billing to United without adjustment or markup.  Tr. 836:3-11.  GLN agreed to pay Ross when United paid GLN for the invoice.  Tr. 836:20-25.

The detente between GLN and United was short-lived.  Shortly after the modification of the parties' agreement, Naekel began to complain anew that various United personnel were interfering with the certification process and that United was not fulfilling its obligations under the agreement.  Tr. 108:1-8; 157:1-11.  A series of meetings followed, and the relationship between the parties quickly devolved.  A blow-by-blow account of events is unnecessary, but the highlights include an alleged physical assault, Tr. 158:15-17; complaints to the FBI of criminal wrongdoing, Tr. 159:15-19; and numerous threats of litigation, Exhibit 19.

---

[5]  These personnel were required in order to apply for the Part 135 certification.  Tr:53:2-7.

After nearly a month and a half of counterproductive meetings, the business relationship between GLN and United had deteriorated beyond the point of repair. United revoked GLN's authority to represent it in its Part 121 certification project, Exhibit 40. In response, GLN suspended work on both the Part 121 and 135 certifications, Exhibit 39, despite United's request and expectation that it would continue working on the Part 135 certification in good faith. Exhibit 40. Although the parties dispute the timing and responsibility for the termination of the relationship, it is apparent that for all intents and purposes the relationship between the parties was terminated in early July 2001.

After the termination of the Part 121 certification, Naekel's behavior became much more erratic. On Monday, July 2, he sent an e-mail to project CEO Stuart Oran questioning his authority to act for United's board of directors and stockholders with respect to the GLN contract and accusing him of "outrageous and illegal impact" on GLN's employees and their future. Exhibit 41. He demanded a personal apology, threatened to escalate the contract matter "into the public arena" immediately, threatened to "go inside" United's headquarters group to challenge Oran's authority, informed Oran that he had called the FBI the preceding Friday, and, confusingly, told Oran that GLN was continuing with the Part 135 certification. *Id.*

On July 9, unbeknownst to United, Naekel e-mailed the FAA informing them that as Director of Operations for the BizJet Charter, Inc. he was stopping the Part 135 certification. Exhibit 52. In that e-mail, he requested the return of the manuals, certification materials, and all documents which had been submitted in relation to the certification. *Id.*

5

On July 10, Naekel sent e-mails to Stuart Oran and Tom Davis, the project COO, seemingly terminating the business relationship between GLN and United. Exhibits 50, 51. Naekel's e-mail to Oran once again invoked the specter of a public prosecution, assuring Oran that he "would be infamous to the stockholders and public as the man solely responsibly [sic] for the billion dollar disaster at UAL." Exhibit 50. On the same day, perhaps in response to this erratic behavior, Stuart Oran sent a fax to the FAA confirming an earlier telephone conversation terminating GLN's authority to represent it in the Part 135 certification process and removing Naekel as the Director of Operations for BizJet.

Ross, the independent contractor recruited by Naekel to act as the Chief Pilot for the BizJet Part 135 certification, was caught in the middle of this crumbling relationship. From April 25 to July 10, 2001, Ross had functioned as BizJet's Chief Pilot on the 135 certification process, attending meetings with GLN and United, working on the necessary manuals, coordinating with the FAA, and locating an airplane suitable for the certification process. Exhibit 30. While hired by GLN, Ross's only duty was to facilitate the 135 application process for United. He received payments from GLN only when payments on his invoices were made to GLN by United. As a result of United's refusal to pay GLN, Ross was not paid for his services for at least a month and a half. Tr. 837:4-7.

At trial, Ross testified that from the beginning of his work on the project he believed his loyalties lay with United, because he had agreed to be the Chief Pilot for BizJet's Part 135 certification process and his name was on the paperwork filed with the FAA. Tr. 838:2-9; Exhibit 16. According to Ross, his loyalty to United remained unchanged, even during

6

the period from July 1 to July 17 when the relationship between GLN and United completely deteriorated.  Tr. 838:10-19.  Feeling that his obligation was to United, not GLN, Ross continued working on the Part 135 certification during this time, Tr. 838:23-839:2; 863:19-864:2, despite Naekel's warning that he was unlikely to be compensated for any work done and his admonition that Ross have no contact with United.  Exhibit 59.

On July 16, Tom Davis called Ross and told him that GLN's involvement with the Part 135 certification had been terminated, and he asked Ross if he would continue working on the project directly for United.  Tr. 747:16-17, 870:22-25.  Ross agreed to continue working on the project, and he agreed to contact Rob Rowland and Jim Davidson, two other contractors working on the certification, to extend a similar invitation on behalf of United. Tr. 871:9-12.  According to Ross, neither he, Rowland, nor Davidson had discussed continuing on the project with United until contacted by Tom Davis and informed that GLN's involvement had been terminated.  Tr. 872:10-18.

After speaking with Davis, Ross contacted Naekel and informed him that he would be staying on to complete the project with United.  Tr. 873:1-3.  Naekel was initially upset, Tr. 386:6-13, but he eventually told Ross that he could not force him to leave the project, but he wished he would.  Tr. 385:19-21.  In a series of subsequent contacts with Jim Davidson, Ross learned that Naekel had informed Davidson to retrieve the manuals prepared and submitted to the FAA for the Part 135 certification.  Exhibit 64.  Ross informed Davidson to retrieve from a third party a variety of materials relating to the Part 135 certification and to change the billing information on the account from GLN to United.  Exhibit 66.

Ross described to Davidson his phone call with Naekel the previous evening, and he admitted telling Naekel he would only help United in "the interim, not the long term, when his true intention was to stay with the project until is was completed." Exhibit 66.  Ross made no statement discussing "taking care of" or firing or reassigning any problematic FAA personnel, made no statement threatening Naekel and his wife, and made no statement directing Davidson to burglarize or take anything from GLN's offices.[6]

On July 18, 2011, GLN sent a letter to United declaring that work had been stopped on the United contract and setting forth numerous allegations of United's contractual breaches.  Exhibit 73.  On July 19, United, through outside counsel, sent formal notice confirming prior communications that the GLN Part 135 certification contract was terminated in its entirety effective July 12, 2001.

After receiving this letter, Naekel undertook a concerted, systematic campaign of malicious misinformation, threats, and hyperbolic statements against Ross and a variety of parties who had been involved with the BizJet certification project.  He did so through e-mails, telephone messages, and postings on GLN's website, and continued his campaign for the next eight years, long after the instant lawsuit was filed.  *See* Exhibit 92.  By his own admission, Naekel did so for the "joy" of seeing Ross "go to prison and be bankrupted and destroyed in civil aviation."  Exhibit 81.  Some of the false statements made by Naekel against Ross included:

---

[6] Although GLN alleges that there are three additional voicemails containing details of additional criminal wrongdoing, transcriptions of these voicemails were not entered into evidence.

"Hear Jon Ross describing how Hobgood has 'taken care' of several named FAA officials in the course of engineering a felony criminal break-in and theft." Exhibit 84.

"[H]ear Mr. Ross . . . laughing as he comments about how he and UAL were 'screwing over' Kris and Jerry Naekel." Exhibit 85.

"[W]e caught Tom Davis' and Stuart Oran's hand picked chief pilot running the burglary and looting our offices." Exhibit 90.

"[V]oice mail messages by UAL Avolar's Chief Pilot . . that in the course of directing the burglary of our Denver offices, that the UAL Avolar Chief Pilot is naming the names of several FAA officials in the Las Vegas FSDO that were being 'take care of' by UAL." Exhibit 90.

"Those tapes were about 12 days after our first FBI meeting in Denver and were calls coordinating the burglary of the GLN offices searching for records from our FBI meeting. The primary voice mails are with a GLN contractor that was secretly working for UAL. He is Jon Ross, a Gulfstream pilot from Long Island, NY. Tom Davis had concocted with him to criminally obtain half a million dollars in project software and is [sic] got into our server, in the middle of the night, and look for any records of the FBI meeting two weeks earlier. The tapes are EXPLOSIVE. Ross is talking about . . . 'taking care' of several named FAA Inspectors in Las Vegas . . . ." Exhibit 92.

"Jon Ross, from Long Island NY, a thief, conspirator and fired from UAL for no misconduct. He is tied to organizing a burglary at the GLN offices." Exhibit 92.

Naekel also attempted to contact Ross directly, leaving the following message on his

home telephone, which is outrageous in both tone and content:

[Unintelligible] son of a bitch, the sherriff's going to be serving the summons on you perhaps as early as a week from tomorrow. I tell you Ross, we're going to take you for millions. That's after you get out of fucking jail. We have you on felony counts, felony fraud, theft, conspiracy, obstruction of justice, witness tampering . . . where you going Jon? You're going to spend about ten years getting fucked in a federal prison then you're going to live the rest of your life in a goddamned tent, because I'm going to make sure you are bankrupt. And, by the way, we have a website that has [unintelligible] . . . . You're a fucking crook Jon. A lying, cheating, backstabbing crook and I'm telling you when you sit in a courtroom here in Colorado with a bunch of Colorado jurors they're going to eat you alive, absolutely gonna eat your fat little New York ass up in a courtroom out here. You're about as low as

9

> anyone has ever, ever come about being.  You're a liar, a cheat, a fraud, and a crook.
> And, we're gonna make sure you get in jail.  Okay?  Understand that Jon.  We're
> gonna make sure you're sitting in prison somewhere.[7]

Exhibit 103.  Ross's fiancé, Patricia Coletto, heard the voice message, and it made her fearful

that somebody, a former business associate, would leave that kind of message on a home

phone.  Tr. 825:13-826:1.  She observed Ross losing sleep over Naekel's allegations, Tr.

828:21-829:7, and she observed several occasions when relatives or friends of Ross notified

them they had seen Naekel's malicious statements on the internet.  Tr. 827:25-828:13.

## CONCLUSIONS OF LAW

### *GLN's Claims*

GLN seeks relief on the basis of three claims:  civil theft, civil conspiracy, and

intentional interference with its contract with United Airlines.  I address each *seriatim*.

*Civil Theft*

GLN argues that Ross orchestrated the theft of its property, and it seeks a statutory

penalty for treble damages and attorney fees.  In order to succeed on the underlying civil theft

claim, GLN had the burden of establishing by a preponderance of the evidence:  "(1) that the

defendant knowingly obtained control over the owner's property without authorization and (2) that

he or she did so with the specific intent to permanently deprive the owner of the benefit of property."

*Itin v. Bertrand T. Ungar, P.C.*, 17 P.3d 129, 134 (Colo. 2000) (citing C.R.S. § 18-4-401(1)).  I find

---

[7]  At trial, Ms. Coletto testified that in this message Naekel said that "he would like to see
[Ross] in jail, fucked up the ass by niggers . . . ."  Tr. 825:20-21.  Although this statement is not
contained in the recording submitted to the court, portions of the recorded message are
unintelligible.  I find Ms. Coletto's testimony credible, and I accept her representation of these
statements as fact.

that GLN has failed to meet its burden of proving that Ross obtained control over GLN's property. Accordingly, it has failed to establish Ross's liability for civil theft, and its claim for statutory damages necessarily fails.

### Civil Conspiracy

GLN also argues that Ross orchestrated and participated in a civil conspiracy to defraud it from the benefits of its contract with United, take and deprive it of its property, breach the implied duty of good faith and fair dealing, and to breach GLN's employees' duty of loyalty and fair dealing with GLN.  GLN had the burden of proving five elements by a preponderance of the evidence to establish the existence of each of these alleged civil conspiracies:

> There must be: (1) two or more persons, and for this purpose a corporation is a person; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof.

*Jet Courier Serv., Inc. v. Mulei*, 771 P.2d 486, 501 (Colo. 1989).  Because I find GLN has failed to establish any unlawful overt acts with regard to any of the alleged conspiracies, Ross is not liable for civil conspiracy.

### Intentional Interference with Contract

Finally, GLN claims that Ross intentionally interfered with its contract with United.  To prevail on this claim, GLN had the duty of establishing by a preponderance of the evidence that:

> (i) it had either a valid existing contract with a third party or that it expected to enter into a contract with a third party; (ii) the defendant induced or otherwise caused the third party to breach the contract or not enter into the contractual relation; and (iii) the defendant did so intentionally and via improper means.

*Harris Grp., Inc. v. Robinson*, 209 P.3d 1188, 1195-96 (Colo. App. 2009).  Although I find that GLN established the existence of a valid existing contract, it has not established that Ross caused

the deterioration of its relationship with United.  To the contrary, the only discernible cause for the deterioration of GLN's relationship with United was Naekel's erratic and often belligerent behavior. Accordingly, Ross is not liable for intentionally interfering with GLN's contractual relationship with United.

### Third Party Plaintiff and Counter-Claimant Ross's Claims

Third Party Plaintiff and Counter-Claimant Ross asserts two claims for relief against Plaintiff GLN and Third Party Defendant Gerald Naekel:  defamation and outrageous conduct.[8]  I address each *seriatim*.

### Defamation

Ross has asserted claims of defamation *per se* against both GLN and Naekel, based on their publication and worldwide distribution via e-mail, regular mail, and websites, of allegations that: (1) Ross conspired with United Airlines to burglarize over $400,000 in technical manuals from the GLN Denver offices, (2) that he was fired by United for misconduct after the alleged theft, and (3) that he was a thief, a cheat, and a conspirator, among other things.  To prevail on this claim, Ross had the duty of establishing:

> (1) a defamatory statement concerning another; (2) published to a third party; (3) with fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special damages or the existence of special damages to the plaintiff caused by the publication.

*Williams v. Dist. Court*, 866 P.2d 908, 911 n.4 (Colo. 1993).  This cause of action "exists to compensate individuals who have suffered harm to their reputations due to the careless or malicious communications of others."  *McIntyre v. Jones*, 194 P.3d 519, 524 (Colo. Ct. App. 2008) (citing

---

[8]  Although Ross initially asserted a third claim, abuse of process, it was withdrawn before trial.

*Keohane v. Stewart*, 882 P.2d 1293, 1297 (Colo. 1994)).   Protection of a person's reputation "reflects no more than our basic concept of the essential dignity and worth of every human being," and recognizes that once an individual's reputation is damaged, it is extremely difficult to restore. *Keohane*, 882 P.2d at 1297-98.

Neither GLN nor Naekel deny responsibility for publishing these statements.  Instead they argue that the statements challenged by Ross are substantially true.  I have thoroughly reviewed the evidence and the parties' arguments, and I find that Ross has adequately established the falsity of these statements.  Accordingly, these statements constitute defamation *per se*.

This is not, however, the end of the inquiry.  The interest in protecting an individual's reputation is not always absolute; it must be weighed against society's interest in encouraging and fostering vigorous public debate.  *See id.* at 1298.  In order to balance these interests, courts have imposed a number of modifications to the common law right of defamation, two of which are at issue here:  the qualified "common interest" privilege and fair comment.

The qualified "common interest" privilege protects "communications by a party with a legitimate interest or duty to persons having a corresponding interest or duty in communications promoting legitimate individual, group, or public interests."  *Williams v. Boyle*, 72 P.3d 392, 400 (Colo. Ct. App. 2003).   Once the privilege is established, "there is a presumption that the communication was made in good faith without malice[, and t]he plaintiff has the burden of rebutting that presumption."  *McIntyre*, 194 P.3d at 529.  The plaintiff may rebut the presumption "by proving that the defendant published the statement with malice; that is, knowing the statement is false or communicating it in reckless disregard for its veracity."  *Id.*

In this case, the qualified "common interest" privilege is inapplicable, because Naekel published the statements in an indiscriminate fashion. By posting the statements on his website, a forum available to anyone with a computer, he "abused the conditional [qualified immunity] privilege by . . . publishing the statements to others who do not have a justified reason to receive the statements." *Thomas v. Pacificorp*, 324 F.3d 1176, 1180 (10th Cir. 2003). Further, as noted above, these statements were false and by his own admission, Naekel made these statements for the "joy" of seeing Ross "go to prison and be destroyed in civil aviation." Exhibit 81. Naekel's malicious intent also forecloses the qualified immunity defense.

Finally, Naekel asserts that these statements are protected as "fair comment." Under the "fair comment" defense, protection is only afforded for statements that involve public officials, public figures, or issues of public concern. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 286 (1964). Ross is neither a public official nor a public figure, so fair comment can only lie if the statements related to an issue of public concern. In determining whether the statements relate to a matter of public concern, I must analyze "the content, form, and context of the statements, in conjunction with the motivation or 'point' of the statements as revealed by the whole record." *Barrett v. Univ. of Colo. Health Sci.'s Ctr.*, 851 P.2d 258, 263 (Colo. Ct. App. 2003). It is apparent from my factual findings that the contested statements are not an issue of public concern. As noted above, they were part of a campaign directed to punish Jonathan Ross. As the Supreme Court has noted, "Purely private defamation has little to do with the political ends of a self-governing society." *N,.Y. Times Co.*, 376 U.S. at 301-02.

The statements made by GLN and Naekel constitute defamation *per se*.  Because none of GLN's or Naekel's affirmative defenses are applicable, GLN and Naekel are liable for defamation against Ross.

*Outrageous Conduct*

Ross also argues that Naekel's conduct has been outrageous.  To state a claim for emotional distress by outrageous conduct, Ross must establish by a preponderance of the evidence that:  (1) [Naekel and GLN] engaged in extreme and outrageous conduct; (2) [Naekel and GLN] engaged in the conduct recklessly or with the intent of causing [Ross] severe emotional distress; and (3) [Ross] incurred severe emotional distress that was caused by the defendant's extreme and outrageous conduct."  *Culpepper v. Pearl Street Bldg., Inc.*, 877 P.2d 877, 882 (Colo. 1994).  Generally, proof of outrageous conduct must consist either of an extreme act, both in character and degree, or a pattern  of conduct from which the decisive conclusion is that infliction of severe mental suffering was calculated or recklessly or callously inflicted on plaintiff. *Brunetti v. Rubin*, 999 F. Supp. 1408, 1412 (D. Colo. 1998).

In this case, on the stipulated evidence presented, an average member of the community, upon seeing and hearing the facts, could view GLN and Naekel's conduct as more than sufficient to support Ross's claim of outrageous conduct.  GLN and Naekel engaged in a coordinated campaign designed to ruin Ross both professionally and financially.  As noted above, GLN and Naekel published and disseminated defamatory statements tarnishing Ross's reputation.  Further, and most troubling, in furtherance of this campaign Naekel left an obscene, threatening voice message on Ross's home answering machine.

15

Ross must also prove that GLN's and Naekel's outrageous conduct actually caused him severe emotional distress. *Culpepper*, 877 P.2d at 882. According to the pattern Colorado Jury Instructions, severe emotional distress consists of highly unpleasant mental reactions, such as nervous shock, fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, or worry, and is so extreme that no person of ordinary sensibilities could be expected to tolerate and endure it. The duration and intensity of emotional distress are factors to be considered in determining its severity. CJI 23:4.

Based on the evidence presented at trial, GLN's and Naekel's conduct caused Ross a great deal of mental anguish. Any person of ordinary sensibilities threatened with the loss of his freedom, his professional reputation, and his financial means could not be expected to tolerate such conduct. The fact that this conduct lasted approximately eight years only reinforces its severity. In summation, I find the GLN and Naekel engaged in the complained of outrageous conduct with the purpose of causing Ross severe emotional distress, and that the conduct actually caused Ross severe emotional distress. Accordingly, GLN and Naekel are liable to Ross for the tort of emotional distress by outrageous conduct.

## Damages

Upon a finding of tort liability, damage remedies potentially include: "(1) compensatory damages, which may be either (a) general or (b) special; (2) punitive or exemplary; and (3) nominal." *Sunward Corp. v. Dun & Bradstreet, Inc.*, 811 F.2d 511, 532 (10th Cir. 1987). Although in certain instances, damages may be presumed, *Id.* at 531-32, I find that Ross has presented virtually no evidence relating to the extent of the damages caused by GLN's and Naekel's defamatory statements. Accordingly, I award nominal damages in the amount of $1.00.

I do, however, find that Ross has adequately alleged damages resulting from GLN's and Naekel's outrageous conduct. Based on the testimony presented at trial, GLN's and Naekel's outrageous conduct caused Ross severe emotional distress. Accordingly, I find it appropriate to award compensatory damages in the amount of $30,000.00. Furthermore, pursuant to Colo. Rev. Stat. § 13-21-102 (2008), exemplary damages are proper in this case. I find the conduct causing Ross's injury to be willful and wanton. Furthermore, I find that GLN and Naekel have continued the complained of conduct that is the subject of Ross's claim against both Ross and other parties during the pendency of the case. Accordingly, I find GLN and Naekel liable for exemplary damages in the amount of $ 90,000.00. *See* Colo. Rev. Stat. § 13-21-102(3) (2008).

## CONCLUSION

After listening to all the testimony and reviewing the exhibits, I am convinced that Mr. Naekel sees the world through a distorted lens. His grasp of reality is often very tenuous. His version of events is exaggerated to make his position seem more favorable, or more victimized, as the situation demands. He testifies to things he did not observe, as if he were present with a clear memory of what he thinks he saw. He attributes adverse motives, conspiracies, and evil intent to all who disagree with him. In short, I find the accuracy of most of his testimony and his credibility as a witness are both lacking.

Based on the foregoing, and my assessment of the parties' relative credibility, I find that GLN has not proven by a preponderance of the credible evidence that Jonathan Ross conspired with United Airlines, or any of its employees, or with anyone else, to interfere with GLN's contract with United, to defraud GLN out of any goods or services, to steal any of GLN's property, or to breach United's duty of good faith and fair dealing with GLN. I further find that Ross did not conspire with

or cause any of GLN's employees to breach their duties of loyalty.  Finally, I find that Ross did not tortiously interfere with GLN's contract with United.  While Naekel obviously had very strong beliefs about the propriety of United's business conduct and ethics, the manner in which he presented them to United was enough to cause a reasonable party to terminate its business relationship with GLN, even if meant terminating a contract to achieve that result.

With respect to Ross's counterclaims against GLN and his third-party claim against Gerald Naekel, I find that both GLN and Naekel undertook a campaign of willful and malicious defamation *per se* against Ross and others following the termination of the United contract, and that Ross incurred substantial damages to his reputation and emotional well-being as a result of that campaign. I find that the campaign continued long after this lawsuit was filed, and that Naekel shows no remorse for the untrue and damaging statements he has published defaming Ross.  In addition, I find that Naekel had published willful and malicious statements against others with whom he disagrees, without regard to whether those statements are true or not.  Furthermore, I viewed videotapes, marked as Exhibits 106 and 107, which Naekel admitted publishing within the six months preceding trial, that constitute defamation *per se* and *per quod* of numerous Colorado attorneys and judicial institutions.

Finally, I find that GLN and Naekel are liable on both of Ross's counterclaims.  Because Ross has not adequately proven damages for GLN's and Naekel's defamation *per se*, I award nominal damages in the amount of $ 1.00.  Ross has, however, also  suffered severe emotional distress caused by Naekel's outrageous conduct.  Based on the injuries caused by this conduct, I find GLN and Naekel liable for $ 30,000.00 in compensatory damages.  Furthermore, I find that  Naekel will probably continue to commit similar vicious and wrongful acts unless and until he learns to

resolve his disputes in a more civilized fashion.  Therefore, I find exemplary damages in the amount of $ 90,000.00 against Naekel personally are also warranted.

Each party shall bear their own attorney fees and costs.


Dated:  March 24, 2011                                    BY THE COURT:

                                                         **/s/John L. Kane**
                                                         Senior U.S. District Judge